**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**JAYSON DON BAILEY,**

       **Plaintiff,**

v.                                          **Case No.: 5:14-cv-29435**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 12 & 15).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's request for summary judgment, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's

1

request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.   Procedural History

On July 12, 2011 and August 9, 2011, Plaintiff Jayson Don Bailey ("Claimant") filed applications for DIB and SSI, respectively, alleging a disability onset date of July 28, 2007, (Tr. at 181, 183), due to "back pain from scar tissue damage, degenerative disc disease, posterior sublexion [*sic*] L5 S1, epidural fibrosis, herniated disc, ruptured disc, [and] depression."[1] (Tr. at 206). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 73-93, 98-111). Claimant filed a request for an administrative hearing, (Tr. at 112), which was held on August 14, 2013 before the Honorable Joseph T. Scruton, Administrative Law Judge ("ALJ"). (Tr. at 29-64). By written decision dated September 3, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-23). The ALJ's decision became the final decision of the Commissioner on October 8, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Motion for Summary Judgment, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15), to which Claimant filed a response, (ECF No. 16). Consequently, the matter is fully briefed

---

[1] Claimant previously filed applications for DIB and SSI on February 24, 2009. (Tr. at 11). Both were denied at the initial determination level on April 15, 2009, and Claimant did not appeal those decisions. (*Id.*)

and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 36 years old at the time he filed the instant applications for benefits, and 38 years old on the date of the ALJ's decision. (Tr. at 23, 181, 183). He is a high school graduate and communicates in English. (Tr. at 205, 207). He has previously worked as a certified nursing assistant at a nursing home and as a cashier at a gas station. (Tr. at 38, 43, 207).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d),

3

416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from

4

the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2012. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that

Claimant had not engaged in substantial gainful activity since July 28, 2007, the alleged disability onset date. (Tr. at 14, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar spine with herniated nucleus pulposus; degenerative disc disease of the thoracic spine with disc bulge; pancreatitis (alcohol-induced, but alcohol abuse is reportedly in remission since hospital admission in December 2012); hypertension; chronic obstructive pulmonary disease ["COPD"]; depressive disorder; and history of back surgery more than 13 years ago." (Tr. at 14, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant is able to occasionally lift and carry 10 pounds, sit for 6 hours in an 8-hour period, and stand and/or walk for 2 hours in an 8-hour period. However, the claimant must have the opportunity to alternate to standing from sitting at the work station at 20-30 minute intervals (that is, briefly stand at the work station from the seated position), and he is unable to perform jobs that require standing and/or walking more than 10-15 minutes at any one time. The claimant is unable to crouch, crawl, or climb ladders, ropes, or scaffolds, and he is limited to no more than occasional balancing, stooping, kneeling, and climbing of ramps or stairs. The claimant is also unable to perform jobs that involve concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, or poor ventilation, as well as those that involve even moderate exposure to hazards. Limitations imposed by depressive disorder and alcohol abuse do not prevent the claimant from performing the basic mental demands of competitive, remunerative, unskilled work delineated in Social Security Ruling 85-15. Specifically, the claimant is able to (on a sustained basis) understand, remember, and carry out simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. However, the claimant is unable to perform jobs that require following detailed or complex instructions.

(Tr. at 16-21, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 21-22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1974, and was defined as a younger individual age 18-49; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," whether or not Claimant had transferable job skills. (Tr. at 22, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform unskilled jobs that existed in significant numbers in the national economy, including work as an assembler, packer, or inspector/tester/sorter at the sedentary exertional level. (Tr. at 22-23, Finding No. 10). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus, he was not entitled to benefits. (Tr. at 23, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. (ECF No. 12 at 9, 11-14). In his first challenge, Claimant argues that the ALJ failed to include limitations related to Claimant's moderate difficulty in maintaining concentration, persistence, or pace in the RFC finding and the controlling hypothetical question posed to the vocational expert at the administrative hearing. (*Id.* at 11). Claimant points out that the ALJ found at step three that Claimant experienced moderate difficulty in maintaining concentration, persistence, or pace; however, Claimant argues that the ALJ inadequately attempted to

account for this limitation in the RFC finding by restricting Claimant to work that did not require following detailed or complex instructions. (*Id.*) According to Claimant, work that involves the understanding and carrying out of simple instructions still requires the ability to stay on task, which Claimant indicates he is incapable of doing. (*Id.*) Claimant contends that the ALJ erroneously found that he could perform "production type" jobs that would require him to keep a pace or meet a quota. (*Id.* at 12). In support of his position, Claimant cites the Fourth Circuit's recent decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). (*Id.* at 11).

In his second challenge, Claimant avers that the ALJ failed to properly evaluate his credibility. (*Id.* at 12-14). Claimant insists that the ALJ failed to explain the support for his finding that Claimant's allegations were inconsistent with the record. (*Id.* at 13). Claimant also contends the ALJ's summarization of his testimony regarding his activities of daily living was inaccurate because the ALJ failed to include many of the caveats that Claimant described in relation to performing certain activities. (*Id.* at 14). For example, Claimant notes that the ALJ wrote that he was able to drive a car; however, Claimant testified that he was only able to drive for a maximum of fifteen minutes. (*Id.*) As another example, Claimant points out that the ALJ noted he was able to shop for groceries, but Claimant testified that he experienced pain if he had to walk from the front of a grocery store to the back of the store. (*Id.*) Overall, Claimant asserts that the ALJ focused almost entirely on the objective medical evidence in the record and did not consider the other credibility factors contained in Social Security Ruling ("SSR") 96-7P, 1996 WL 374186.

In response, the Commissioner argues that Claimant has failed to indicate what additional limitations the ALJ should have included in Claimant's RFC. (ECF No. 15 at 10). Moreover, in formulating Claimant's RFC, the Commissioner contends that the ALJ

acknowledged Claimant's allegation of depression, assessed Claimant's reported activities, which included reading, driving a car, shopping for groceries, preparing meals, and interacting with others, and considered the examination findings of a consultative psychologist. (*Id.* at 10-11). The Commissioner points out that Judith F. Lucas, M.A., the consultative psychologist who examined Claimant, found that his persistence and pace were within normal limits while his concentration was mildly deficient. (*Id.* at 11). Additionally, the Commissioner asserts that Claimant's depression was partly impacted by alcohol abuse and that Claimant's mental health treatment was limited to medication prescribed by a physician's assistant and one mental health counseling appointment. (*Id.*) As to Claimant's reliance on *Mascio*, the Commissioner retorts that the ALJ considered each of the relevant mental functions pertinent to Claimant's ability to perform work and appropriately limited Claimant to jobs that did not require following detailed or complex instructions. (*Id.* at 12).

On the subject of Claimant's second challenge, the Commissioner asserts that the ALJ thoroughly reviewed the medical evidence in the record when analyzing Claimant's credibility. (*Id.* at 13). The Commissioner argues that radiological studies in 2010 and 2013 showed that Claimant's lumbar spine was stable apart from some small disc herniation and mild canal stenosis secondary to a mild disc bulge. (*Id.*) Furthermore, the Commissioner claims that Claimant's hypertension was controlled with medication and that the findings related to Claimant's COPD were innocuous. (*Id.* at 13-14). In addition, the Commissioner asserts that Claimant received conservative treatment for his impairments and had not seen a specialist for his impairments in many years. (*Id.* at 14). The Commissioner also argues that Claimant's usual daily activities belie some of his allegations. (*Id.*) Finally, the Commissioner argues that the medical opinion evidence

supports the ALJ's credibility finding. (*Id.*)

In his response brief, Claimant reiterates both of his challenges, but primarily focuses on the first challenge. (ECF No. 16 at 1-2). Claimant argues that only a limitation related to his ability to stay on task could have accounted for his moderate deficiency in maintaining concentration, persistence, or pace. (*Id.* at 1). Moreover, Claimant asserts that the ALJ failed to explain why he excluded any such limitation from the RFC finding. (*Id.* at 1-2).

## V.     Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### A. Treatment Records

On August 3, 1998, Claimant was admitted to Carilion Roanoke Memorial Hospital for a right L5-S1 discectomy. (Tr. at 609). While working in a convenience store unloading stock on July 28, 1998, Claimant felt immediate right hip and leg pain. (*Id.*) Claimant's pain worsened over time, and he attempted bed rest and other treatment in an attempt to avoid surgery; however, he could no longer tolerate the pain. (*Id.*) A CT scan showed a large, free fragment disc rupture at L5-S1. (*Id.*) Consequently, James M. Vascik, M.D., performed a right L5-S1 hemilaminotomy, mesial facetectomy, and discectomy. (Tr. at 611-12). Pathology results from the lumbar spine discectomy showed degenerated disc tissue and bone fragments. (Tr. at 614).

On December 12, 2007, Claimant presented to Greenbrier Physicians, Inc. and was examined by Joseph Lutz, PA-C ("PA Lutz"). (Tr. at 371-72). Claimant indicated that he had recovered well from his previous back surgery, but was experiencing back pain after

10

lifting boxes at work. (Tr. at 371). He described radicular burning and stinging pain down both legs, which was worse on the right side. (*Id.*) Claimant also reported problems sleeping and feelings of depression, worthlessness, and thoughts of death, although he denied any suicidal or homicidal urges or plans. (*Id.*) Advil and Aleve did not relieve Claimant's pain. (*Id.*) PA Lutz noted that Claimant appeared upset, anxious, genuine, and sincere. (*Id.*) He assessed Claimant with depression secondary to chronic pain, hypertension, and chronic back pain status post discectomy L5-S1. (*Id.*) PA Lutz prescribed ibuprofen 800 mg and tramadol and gave Claimant samples of Cymbalta. (*Id.*)

Claimant returned to PA Lutz on January 11, 2008, primarily for cough and cold symptoms. (Tr. at 369). He reported that Cymbalta had helped his back pain, but he continued to experience pain. (*Id.*) He also told PA Lutz that tramadol was not helpful and ibuprofen made him nauseous. (*Id.*) PA Lutz was hesitant to prescribe narcotic pain medication as Claimant was a new, relatively unknown patient. (*Id.*) He provided Claimant with additional samples of Cymbalta. (*Id.*)

On March 5, 2008, Claimant treated with PA Lutz for an acute onset of stiff neck bilaterally that radiated from the occiput down to the sacroiliac ("SI") joints bilaterally. (Tr. at 365). PA Lutz also noted for several visits, Claimant's blood pressure had been elevated and Lisinopril was not quite controlling his hypertension. (*Id.*) Upon examination, Claimant had decreased range of motion of his neck and upper extremities in all directions. (*Id.*) Claimant's trapezius muscle was tender from the neck to the SI joint in the paraspinal area bilaterally, but no SI joint tenderness was observed. (*Id.*) Claimant was assessed with hypertension and myalgia with spasm. (*Id.*) PA Lutz prescribed Cymbalta, Flexeril, and Verapamil. (Tr. at 365-66).

Claimant again visited PA Lutz on July 23, 2008 for his back pain. (Tr. at 361). At

that visit, Claimant requested a letter for disability. (Tr. at 361). Claimant insisted that his goal was to receive a temporary medical card so that he could receive the necessary treatment to rejoin the work force. (*Id.*) PA Lutz noted that Claimant was in no acute distress and reported no significant changes. (*Id.*) He was assessed with back pain, depression, and hypertension. (*Id.*) Claimant received prescriptions for Lisinopril-Hydrochlorothiazide and Verapamil, and PA Lutz agreed to write the disability letter. (*Id.*)

On October 21, 2008, Claimant followed up with PA Lutz for his back pain. (Tr. at 356). Claimant explained that he had recently qualified for a medical card. (Tr. at 356). He complained of intermittent radicular pain and dysesthesias down his legs depending on his movements. (*Id.*) He also reported trouble sleeping due to pain. (*Id.*) Upon examination, Claimant's lungs exhibited end expiratory wheezing in all lung fields. (*Id.*) He experienced paravertebral and vertebral tenderness in his back as well as SI joint tenderness. (*Id.*) Claimant was unable to raise his leg for straight leg raise with dorsiflexion without having pain down the posterolateral part of the leg to the distal calf on the lateral aspect bilaterally. (*Id.*) Claimant's deep tendon reflexes were 2+ and symmetrical. (*Id.*) A Patrick's test caused pain in Claimant's low back on the left side. (*Id.*) PA Lutz diagnosed Claimant with back pain with radiation, low back pain (lumbago), bronchitis, chest pain, depression, hypertension, chronic pain, and tobacco abuse. (Tr. at 357). PA Lutz ordered x-rays of Claimant's lumbosacral spine and chest, as well as a pulmonary function study. (*Id.*) He prescribed Advair Diskus and Darvocet. (*Id.*) He also asked Claimant to stop smoking, but Claimant indicated he was not ready to do so. (*Id.*)

On October 21, 2008, at Greenbrier Physicians, Inc., Claimant underwent a pulmonary function study that revealed mild ventilatory impairment. (Tr. at 375-77). That same day, Claimant underwent an x-ray of his lumbar spine and chest, which showed

osteopenia on the lumber spine (Tr. at 378).  In addition, Schmorl's node formation was seen in the lower thoracic and lumbar spine; sclerosis was found within Claimant's lower facet joints, particularly at L4-5 and L5-S1, and there was mild disc space narrowing throughout the lumbar spine. (*Id.*) The chest x-ray showed calcified granulomatous change; however, the heart was not enlarged, and there was no edema, consolidation, or effusion. (*Id.*)

Claimant returned to PA Lutz on November 4, 2008 reporting that Darvocet did not relieve his back pain. (Tr. at 354). Upon examination, Claimant appeared very uncomfortable, and PA Lutz observed that Claimant experienced decreased range of motion in his back in all directions. (*Id.*) Claimant was assessed with back pain status post-surgical repair and improved asthma. (*Id.*) PA Lutz ordered an MRI of Claimant's back because the x-rays showed non-specific findings and Claimant continued to report pain in that area. (*Id.*) PA Lutz also prescribed Lortab for Claimant's pain. (*Id.*)

An MRI of Claimant's lumbar spine was taken on November 19, 2008 at Greenbrier Valley Medical Center. (Tr. at 374). David C. Maki, D.O., found degenerative change with degenerative disc disease at L4-5 and L5-S1. (*Id.*) Dr. Maki also observed scattered Schmorl's node defects in the lumbar and thoracic regions. (*Id.*) Claimant's T12 demonstrated some wedging, and there was some mild posterior subluxation of L5 on S1. (*Id.*) Dr. Maki remarked that there was disc space narrowing at L5-S1 with prominent right neural foraminal encroachment though somewhat inferiorly located in the neural foramina. (*Id.*) Facet arthrosis and hypertrophy were also seen. (*Id.*) Dr. Maki saw disc herniation more inferiorly with some enhancement, but noted that it appeared to likely be some enhanced component consistent with unenhanced epidural fibrosis or disc recurrence at that level. (*Id.*)

13

Claimant next treated with PA Lutz for his back pain on November 24, 2008. (Tr. at 352). PA Lutz noted that Claimant had undergone an MRI of his back, which showed degenerative disc disease and postoperative changes with some epidural fibrosis and subluxation of L5 on S1 with prominent right neuroforamen encroachment inferior to the L5-S1. (*Id.*) Upon examination, Claimant had decreased range of motion in his back. (*Id.*) Claimant moved slowly and stiffly. (*Id.*) He was assessed with chronic back pain and improved asthma. (*Id.*) Claimant was referred to neurosurgery for evaluation of back pain. (Tr. at 352-53).

Claimant presented to Barry K. Vaught, M.D., neurologist, on February 19, 2009. (Tr. at 252-55). Upon examination, Claimant's motor strength was 5/5 bilaterally in his upper and lower extremities, and his muscle tone was normal. (Tr. at 252). Sensation was intact and reflexes were 2+, with the exception of a reduced right ankle jerk. (*Id.*) Dr. Vaught observed that Claimant's gait was antalgic. (*Id.*) He assessed Claimant with lumbosacral radiculopathy. (*Id.*) Claimant underwent an EMG study for evaluation of lumbosacral radiculopathy at that appointment. (Tr. at 254-55). Dr. Vaught found that Claimant's right peroneal and tibial motor studies were normal. (Tr. at 255). Claimant's right superficial peroneal and sural sensory potentials were also normal, and his H-reflex responses were symmetric. (*Id.*) In addition, Dr. Vaught observed that Claimant's right peroneal and tibial F-wave latencies were normal. (*Id.*) However, Dr. Vaught noted that concentric needle examination of selected right lower extremity and lumbosacral paraspinal muscles showed abnormal spontaneous activity in the S1 innervated muscles. (*Id.*) Dr. Vaught concluded the study was abnormal given the electrophysiological evidence of active right S1-2 radiculopathy. (*Id.*) He prescribed Neurontin and therapy for Claimant's low back. (Tr. at 253). He also referred Claimant to Neurological Associates in

14

Charleston for a surgical evaluation. (*Id.*)

On March 11, 2009, Claimant underwent evaluation at Rainelle Physical Therapy by Robert Schuetz, LPT. (Tr. at 256-57). Claimant informed Mr. Schuetz that his pain was constant and was mostly posterior on the right side to his toes. (Tr. at 256). He also reported pain in his left buttock. (*Id.*) Upon observation, Claimant was ambulatory with short, slow steps and one degree trunk with bilateral leg stiffness. (*Id.*) Claimant had trouble lying on the table and was unable to lay on his stomach. (*Id.*) Mr. Schuetz noted that Claimant's pain increased with moderate pressure to the lower back and SI. (*Id.*) Claimant's trunk range of motion was ten degrees flexion, fifteen degrees right lateral side flexion, twelve degrees left lateral side flexion, and no extension. (*Id.*) Mr. Schuetz recorded that Claimant's trunk strength was 4/5, and his sensation was normal. (*Id.*) A right straight leg raise was ten degrees with increased pain to 10/10, and a left straight leg raise was sixty degrees with 7/10 moderate pain in Claimant's leg and back. (*Id.*) Claimant's bilateral patella reflex was one degree. (*Id.*) Mr. Schuetz assessed Claimant as fair and remarked that Claimant should benefit from a physical therapy program to decrease his pain while increasing his range of motion and strength so that he could perform daily activities. (*Id.*) Mr. Schuetz recommended physical therapy three times each week for six to eight weeks. (Tr. at 257).

Claimant visited James D. Weinstein, M.D., at University Physicians and Surgeons on March 18, 2009. (Tr. at 624). Dr. Weinstein noted that Claimant complained of low back pain that radiated to the leg, and numbness radiating to the lateral aspect of the foot and small toe. (Tr. at 622). Upon examination, a straight leg raise test was positive at forty-five degrees bilaterally. (*Id.*) Dr. Weinstein noted that the ankle jerk was present, which surprised him, and he saw no peripheral weakness. (*Id.*) Dr. Weinstein reviewed

Claimant's lumbar spine MRI and opined that it did "not look too bad." (*Id.*) Dr. Weinstein opined that Claimant might benefit from a nerve block at S1 on the right. (*Id.*)

Claimant returned to PA Lutz on April 9, 2009 with complaints of chronic back pain. (Tr. at 344). Claimant informed PA Lutz that he was going to a pain clinic, and he requested a TENS unit, which he had previously tried and found very helpful in relieving his pain. (*Id.*) Claimant indicated that he was prescribed Neurontin 300 mg three times per day, but the drug made him too tired, so he only took it twice each day. (*Id.*) Upon examination, Claimant's lungs were clear; however, his breath sounds were somewhat distant. (*Id.*) PA Lutz observed no pedal edema. (*Id.*) Claimant did experience left lower paravertebral muscle tenderness as well as SI joint tenderness. (*Id.*) A straight leg raise test with dorsiflexion was immediately positive. (*Id.*) Strength against resistance was 4/5 as compared to the right. (*Id.*) PA Lutz recorded that Claimant's deep tendon reflexes were 2 to 3+ and symmetrical. (*Id.*) Claimant was assessed with hypertension, chronic back pain, lower left extremity radiculopathy, hyperlipidemia, and vitamin D deficiency. (*Id.*) PA Lutz prescribed a TENS unit. (*Id.*)

Claimant visited PA Lutz six more times in 2009. On June 10, Claimant continued to have back pain and told PA Lutz that he was scheduled to have a nerve block in the future. (Tr. at 342). On June 25, Claimant was sent by his attorney for a physical to "help him with his disability." (Tr. at 339). PA Lutz noted that he completed a Medical Assessment of Ability to Do Work Related Activities form that day.[2] (*Id.*) Claimant returned on July 29 for a DHHR physical. (Tr. at 337-38). On August 25, Claimant informed PA Lutz that he was feeling pretty well. (Tr. at 335). He continued to have

---

[2] That assessment is not contained in the administrative record.

chronic pain and was waiting for an appointment with a pain clinic. (*Id.*) On October 28, Claimant reported that he was having trouble obtaining his pain medicine because the pain clinic he was attending had closed. (Tr. at 331). He returned on December 9 for follow up with regard to his hyperlipidemia. (Tr. at 328). Claimant continued to have chronic back pain, but stated that he was treating at a pain clinic. (Tr. at 329).

On March 26, 2010, Claimant informed PA Lutz that he was doing "pretty well" overall, but he was becoming depressed over not being able to work. (Tr. at 325). Claimant stated that he had increased his beer consumption to a six-pack per day. (*Id.*) Claimant also continued to smoke. (Tr. at 326). He indicated that he was receiving epidural injections at a pain clinic for his back pain. (*Id.*) Upon examination, Claimant had no chest pain or shortness of breath. (*Id.*) His lungs were clear though breath sounds were somewhat distant. (*Id.*) PA Lutz recorded that Claimant appeared in no acute distress, but he seemed sad. (*Id.*) He advised Claimant to stop drinking for the next three weeks. (*Id.*) Claimant requested an appointment with a counselor for assistance with chronic pain, and PA Lutz referred Claimant for chronic pain counseling. (*Id.*)

On April 13, 2010, Claimant received a transforaminal lumbar epidural steroid injection at an appointment with David L. Caraway, M.D. (Tr. at 268). Dr. Caraway noted that Claimant's diagnoses included lumbar radiculitis and post laminectomy syndrome. (*Id.*) No motor or sensory deficits were observed after the injection. (Tr. at 268-69).

Claimant returned to PA Lutz on April 23, 2010 and stated that he had cut back on alcohol consumption. (Tr. at 323). Claimant also reported that he had received pain relief with treatment at the pain clinic. (*Id.*) Claimant was assessed with vitamin D deficiency, hyperlipidemia, abnormal liver functions, gastroesophageal reflux disease ("GERD"), and yeast dermatosis. (Tr. at 324). Claimant was told to reduce his alcohol consumption. (*Id.*)

17

Claimant received another transforaminal lumbar epidural steroid injection on May 25, 2010. (Tr. at 264). Dr. Caraway noted that Claimant tolerated the procedure well. (*Id.*) Claimant was scheduled for another injection the following month; however, on June 22, 2010, he canceled the appointment as he felt the injections were not helping with his pain. (Tr. at 262).

On July 22, 2010, Claimant was examined by Dr. Caraway. (Tr. at 278-79). Dr. Caraway indicated that Claimant was being seen for right-sided lumbar radiculopathy that began fourteen years prior. (Tr. at 278). He noted that Claimant had been seen by Dr. Weinstein who did not recommend surgery. (*Id.*) In addition, Dr. Caraway remarked that Claimant had undergone two injections, and although the first one decreased his pain for a couple of weeks, the second injection did not help. (*Id.*) At that time, Claimant's medications included Lortab and Lyrica. (*Id.*) Dr. Caraway observed that Claimant exhibited decreased range of motion of the bilateral lower extremities, and a straight leg raise test was positive on the right, but negative on the left. (*Id.*) Claimant had no focal deficit, and his gait was slightly antalgic. (*Id.*) Claimant was assessed with lumbar radiculopathy and post laminectomy syndrome of the lumbar spine. (*Id.*) Claimant indicated that he wished to see Dr. Weinstein again, and Dr. Caraway stated that he would try to schedule that appointment. (Tr. at 279). Dr. Caraway also increased Claimant's Lortab dosage after warning Claimant about the effects of opioid treatment. (*Id.*)

PA Lutz saw Claimant on August 23, 2010 for a routine visit. (Tr. at 312-18). Claimant complained of fatigue and chronic pain. (Tr. at 314). He also reported that taking Trazadone to help him sleep resulted in grogginess the next day. (*Id.*) Additionally, Claimant indicated that he experienced sleep issues, mood swings, feeling "down," and difficulty concentrating. (Tr. at 315). Claimant reported drinking four to six beers each

night and smoking up to two packs of cigarettes per day. (Tr. at 314, 316). Upon examination, PA Lutz observed that Claimant appeared healthy and in no acute distress. (Tr. at 316). Claimant was alert, oriented, and cooperative with a normal affect. (*Id.*) PA Lutz recorded that Claimant's gait was normal, and there were no signs of kyphosis or scoliosis. (*Id.*) Claimant exhibited normal muscle strength and joint range of motion; however, Claimant did have decreased range of motion in his back. (*Id.*) Claimant was assessed with asthma, back pain, back pain with radiation, depression, GERD, glucose intolerance, hypertension, hypertriglyceridemia, chronic pain, tobacco abuse, and vitamin D deficiency. (Tr. at 317). PA Lutz prescribed Advair Diskus and citalopram. (*Id.*)

On December 8, 2010, Claimant underwent an MRI of his lumbar spine at St. Mary's Medical Center. (Tr. at 260, 277, 621). David M. Keadle, M.D., found that the vertebral bodies were of normal height and alignment. (*Id.*) He observed very mild canal stenosis at T11-T12 secondary to a mild disc bulge as well as ligamentum flavum hypertrophy. (*Id.*) Otherwise, Dr. Keadle noted no canal stenosis, neural foraminal stenosis, or disc herniation. (*Id.*)

Claimant returned to PA Lutz on December 22, 2010. (Tr. at 303-09). Claimant again reported back stiffness and pain. (Tr. at 306). He also complained of difficulty sleeping, mood swings, feeling down, feeling sad, and difficulty concentrating. (*Id.*) Claimant indicated that he had been taking Cymbalta, but he did not like the way that it made him feel. (*Id.*) PA Lutz's findings were the same as the previous appointment. (Tr. at 307). Claimant was advised to stop smoking and avoid alcohol, sweets, and simple carbohydrates. (Tr. at 308). Claimant was instructed to continue his medication regimen; however, Citalopram was discontinued. (Tr. at 305, 308).

Dr. Weinstein examined Claimant on January 19, 2011. (Tr. at 272-76, 615). Dr.

Weinstein recorded that he had examined Claimant in March 2009 and did not feel Claimant had any operative pathology. (Tr. at 272, 615). Dr. Weinstein remarked that a recent MRI showed the same symptoms with only mild canal stenosis at T11-12, which he believed would not require surgical intervention. (*Id.*) He also opined that the scar tissue from Claimant's prior surgery partially caused his issues. (*Id.*) Dr. Weinstein indicated that Claimant was a candidate for a dorsal column stimulator; however, Medicaid would not pay for insertion of the device. (*Id.*)

Claimant returned to PA Lutz on March 2, 2011 reporting that he had some legal problems and had been under a lot of stress. (Tr. at 301). Claimant also stated that he had increased his alcohol intake. (Tr. at 302). PA Lutz recorded that Claimant was pacing, fidgety, and emotionally upset with poor eye contact during the appointment. (*Id.*) Claimant was not suicidal or homicidal, and after a discussion about Claimant's emotional state, he declined a recommendation to see a counselor. (*Id.*) Claimant was assessed with situational anxiety and elevated liver function tests, aggravated by increased alcohol consumption. (*Id.*) A liver ultrasound and hepatitis screen were ordered. (*Id.*) The liver ultrasound performed on March 9, 2011 at Greenbrier Physicians by Colin Rose, M.D., revealed a diffuse increase in the echogenicity of the liver, which was consistent with fatty infiltration. (Tr. at 373).

Claimant underwent a physical examination by PA Lutz for the purpose of a DHHR examination on March 24, 2011. (Tr. at 296-97). He was assessed with alcoholic fatty liver, back pain with radiation, depression, hypertension, hypertriglyceridemia, tobacco abuse, and transaminase and/or LDH elevation. (*Id.*) PA Lutz prescribed sertraline. (Tr. at 297).

Claimant treated with PA Lutz several more times in 2011. (Tr. at 284-95, 499-510). On June 1, 2011, Claimant stated that he continued to consume alcohol on a daily

basis. (Tr. at 294). Claimant indicated that he still visited a pain management clinic for his back. (*Id.*) PA Lutz offered Claimant an appointment with Seneca Mental Health for assistance with alcohol cessation, but Claimant declined. (*Id.*) On August 1, Claimant complained of back stiffness and pain along with radicular pain in the right lower extremity. (Tr. at 288). Claimant stated that bending, twisting, and rotating his back exacerbated his pain and that he could only walk approximately 100 feet without experiencing pain. (*Id.*) In addition, Claimant indicated that he felt irritable, sad, down, and fatigued. (Tr. at 289). Upon examination, Claimant was alert, oriented, and cooperative with a normal affect. (*Id.*) His gait was normal, but PA Lutz observed decreased range of motion of the back with flexion, rotation, and lateral bending. (Tr. at 290). PA Lutz recorded that he would refer Claimant to Beckley Pain Clinic. (Tr. at 291). On September 1, Claimant informed PA Lutz that he continued to drink heavily and smoke. (Tr. at 500). PA Lutz reported that when he discussed cessation with Claimant, Claimant "smiled and shrugged." (*Id.*) On September 22, Claimant advised he was doing very well, but stated that he had breathed in a great deal of sawdust while sanding down an old cedar chest, which caused him nasal congestion, facial pain, and headache. (Tr. at 501-02). On October 6, Claimant reported taking Metoprolol for his hypertension as prescribed with no problems. (Tr. at 503). He was congested, and examination of his lungs was positive for wheezes, rales, and squeaks only partially cleared with cough. (Tr. at 504). Claimant was assessed with sinusitis, early otitis, COPD, and tobacco abuse. (*Id.*)

On March 27, 2012, Claimant presented to Greenbrier Valley Medical Center Emergency Department for complaints of severe epigastric pain, nausea, and intermittent chest pressure with no radiation. (Tr. at 668, 671). Claimant exhibited appropriate behavior and was able to ambulate independently. (Tr. at 668). He indicated that he could

perform all activities of daily living without assistance. (*Id.*) Claimant also stated that he drank a six-pack of beer each day. (Tr. at 685). Claimant's heart rate was seventy-eight and the heart monitor showed normal sinus rhythm. (Tr. at 668). His respiratory effort was not labored. (*Id.*) Upon examination, there was no respiratory distress and Claimant's lungs were clear with equal breath sounds bilaterally. (Tr. at 672). Claimant's heart rate and rhythm were normal with no murmurs, clicks, gallops, or rubs. (*Id.*) Claimant's spine was non-tender, and he retained normal range of motion in his joints. (*Id.*) Claimant's extremities were negative for swelling, deformities, cyanosis, clubbing, and edema. (*Id.*) An ultrasound of Claimant's abdomen showed a fatty liver and mildly distended gallbladder. (Tr. at 674). A chest x-ray was normal. (Tr. at 676). A CT scan of Claimant's abdomen and pelvis was performed, which revealed pancreatitis. (Tr. at 677). On March 31, 2012, Claimant was discharged with a final diagnosis of acute alcoholic pancreatitis, alcoholism, and heavy tobacco use. (Tr. at 682). Claimant was instructed to seek help for alcohol and tobacco abuse. (*Id.*)

On April 11, 2012, and May 10, 2012, Claimant again visited PA Lutz. (Tr. at 436, 451). At both visits, Claimant reported no problems since being discharged from the hospital for treatment of pancreatitis. (*Id.*) In April, Claimant indicated that his back pain was of moderate intensity, and he described the pain as radiating into his right and left buttock as well as right leg. (Tr. at 436). In May, Claimant informed PA Lutz that he had not noticed any increase in his back pain. (Tr. at 451). On both occasions, PA Lutz noted that Claimant continued to drink alcohol despite his recent treatment for pancreatitis. (Tr. at 436, 451). Claimant also reported experiencing anxiety and depression. (Tr. at 438, 453). At both appointments, the examination findings were similar. Claimant appeared in no acute distress. (*Id.*) PA Lutz observed that Claimant's mood was normal, and his

affect was appropriate. (Tr. at 439, 454). Claimant's judgment and insight were intact. (*Id.*) PA Lutz also remarked that Claimant's coordination and gait were normal. (*Id.*) A cardiovascular examination was normal, and a respiratory examination revealed unlabored breathing with prolonged breath sounds throughout the chest with a faint end expiratory wheeze. (*Id.*) No joint inflammation or tenderness was observed. (*Id.*) Claimant was assessed with type II diabetes, vitamin D deficiency, other chronic pain, esophageal reflux, backache, tobacco addiction, depression, benign hypertension, alcoholic fatty liver, and pancreatitis. (Tr. at 440, 454-55). At both visits, PA Lutz noted that he would refer Claimant to a pain clinic in Beckley. (Tr. at 440, 455).

On June 28, 2012, Claimant reported to the Greenbrier Valley Medical Center Emergency Department with complaints of severe abdominal pain, nausea, and vomiting, which he stated began earlier in the day. (Tr. at 633, 638). Claimant further indicated that he drank a twelve-pack of beer each day and experienced chronic back pain. (Tr. at 638). In addition, he stated that he was able to perform all activities of daily living without assistance and ambulate independently. (Tr. at 630). Upon examination, Claimant appeared to be in moderate distress. (Tr. at 634). Test results revealed that Claimant's amylase level was greater than 1200, his lipase level was greater than 27000, and his white blood cell count was 17.8 (Tr. at 639). An x-ray of Claimant's abdomen showed a nonspecific pattern. (Tr. at 637). Connie Anderson, D.O., recorded that Claimant was positive for acute abdominal pain in the upper epigastric area. (Tr. at 638). She assessed Claimant with acute pancreatitis, history of pancreatitis, alcohol abuse, nicotine abuse, and lumbar degenerative disc disease with prior surgery. (Tr. at 639). Dr. Anderson opined that Claimant would need to see a gastroenterologist and transferred Claimant to Cabell Huntington Hospital in stable, critical condition. (Tr. at 632, 634, 639).

On July 11, 2012, Claimant returned to PA Lutz. (Tr. at 472). PA Lutz noted that Claimant had recently experienced a second "major flare of pancreatitis," which was treated at Cabell Huntington Hospital. (*Id.*) Claimant's discharge diagnosis from the hospital was alcoholism pancreatitis, and a CT scan showed peri-pancreatic inflammation and a fatty liver. (*Id.*) Claimant reported experiencing ongoing nausea and difficulty sleeping; he denied using alcohol in the previous two weeks. (*Id.*) Upon examination, PA Lutz observed that Claimant's mood and affect were normal. (Tr. at 474). Claimant's judgment and insight were intact. (*Id.*) His gait and coordination were both normal. (*Id.*) Claimant's diagnoses remained the same as his prior visit with PA Lutz, and he was prescribed thiamine hydrochloride, Donnatal, and Zofran. (Tr. at 475).

Claimant visited PA Lutz twice more in July 2012. (Tr. at 480, 486). On July 16, Claimant indicated that his nausea, shaking, and difficulty sleeping had decreased. (Tr. at 480). PA Lutz's examination findings were essentially normal, and Claimant was prescribed nystatin and amitriptyline. (Tr. at 482-83). On July 23, Claimant reported experiencing nausea after eating, but his shaking and difficulty sleeping had again decreased. (Tr. at 486). Physical and psychiatric examination findings were unremarkable, and Claimant was prescribed Dramamine, Cleocin, and Culturelle. (Tr. at 488-89).

On July 30, 2012, Claimant underwent an ultrasound of his gallbladder at Greenbrier Physicians, Inc. (Tr. at 493). Heather Rose, M.D., recorded that the echogenicity of Claimant's liver was increased, which suggested a fatty change. (*Id.*) Dr. Rose observed no gallstones or biliary tree dilatation. (*Id.*) The next day, PA Lutz went over Claimant's ultrasound results with him. (Tr. at 494). Claimant informed PA Lutz that he had not drank alcohol in thirty-five days. (*Id.*) Claimant reported suffering from

nausea, and PA Lutz instructed Claimant to stop taking thiamine hydrochloride. (Tr. at 494, 496).

Claimant returned to PA Lutz on December 3, 2012, and denied experiencing nausea. (Tr. at 511). He informed PA Lutz that he was drinking alcohol again. (*Id.*) Claimant also reported that he had been "cut off" from his pain clinic, which was providing him with hydrocodone and acetaminophen 7.5-500. (*Id.*) PA Lutz noted that cardiovascular and respiratory examinations were normal. (Tr. at 514).

On December 18, 2012, Claimant arrived at the Greenbrier Valley Medical Center Emergency Department with complaints of abdominal pain, vomiting, nausea, and diarrhea. (Tr. at 649). Claimant indicated that his symptoms were similar to those in the past when he had a pancreatic flare up. (Tr. at 646). A review of systems was also positive for back pain. (Tr. at 649). Claimant reported that he was able to ambulate independently and perform all activities of daily living without assistance. (Tr. at 646). He stated that his last alcoholic drink occurred within the prior week and that he drank a twelve-pack or case of beer each night. (Tr. at 654). Upon examination, Claimant's abdomen was tender in the left upper quadrant. (Tr. at 650). His spine was non-tender, and his muscle strength was 5/5. (Tr. at 650, 655). Claimant maintained full range of motion in all four extremities. (Tr. at 655). Blood test results revealed that Claimant's amylase, lipase, and white blood cell levels were abnormal. (Tr. at 650). Claimant's treaters diagnosed him with acute alcoholic pancreatitis. (Tr. at 656). He responded well to bowel rest, analgesics, and antiemetics, and he was discharged two days later free of pain. (Tr. at 653). Claimant was instructed to continue taking his medications and to stop drinking alcohol. (*Id.*)

On January 8, 2013, Claimant underwent an MRI of his lumbar spine at St. Mary's Medical Center. (Tr. at 627). Jason Akers, M.D., compared the MRI to Claimant's

December 2010 lumbar spine MRI. (*Id.*) Dr. Akers observed a new small disc herniation of the protrusion type at L5-S1 that touched, but did not compress, Claimant's S1 nerve root in the lateral recess. (Tr. at 628). Otherwise, Dr. Akers concluded that Claimant's lumbar spine appeared stable. (*Id.*)

Claimant treated with PA Lutz several times from January 2013 to May 2013. (Tr. at 551, 558, 563, 568, 574, 581). At many of those visits, Claimant informed PA Lutz that he continued to drink alcohol. (Tr. at 558, 563, 568, 574). At Claimant's March 18 and April 18 appointments, PA Lutz observed that Claimant's mood and affect were normal. (Tr. 571, 577). On May 9, Claimant complained of arthralgias after working in his garden. (Tr. at 581). PA Lutz recorded that Claimant's mood and affect were normal, and he was in no acute distress. (Tr. at 584). A cardiovascular examination was normal and a respiratory examination revealed unlabored breathing with prolonged expiration and harsh breath sounds at the bases. (*Id.*) Claimant was assessed with a backache and prescribed meloxicam. (Tr. at 585).

On May 21, 2013, Claimant visited the Greenbrier Valley Medical Center Emergency Department with complaints of abdominal pain and nausea. (Tr. at 699). Claimant indicated that the pain began one week prior. (Tr. at 697). He was able to ambulate independently, and he reported that he was able to perform his activities of daily living without assistance. (*Id.*) Upon examination, Claimant's abdomen was mildly tender. (Tr. at 700). His spine was non-tender, and he retained normal range of motion in his joints. (*Id.*) No motor or sensory deficits were observed. (Tr. at 697, 700). Blood test results revealed an abnormal level of amylase; however, Claimant's lipase and white blood cell levels were normal. (Tr. at 700-01). Claimant's treater diagnosed him with acute abdominal pain and alcohol abuse. (Tr. at 701). Claimant was instructed to abstain from

drinking alcohol and discharged in stable condition that same day with instruction to follow up with his primary care physician. (Tr. at 701-02).

On June 3, 2013, Claimant underwent an ultrasound of his gallbladder at Greenbrier Physicians, Inc. (Tr. at 598). Colin Rose, M.D., observed that Claimant's gallbladder wall was slightly irregular and mildly thickened, which could indicate cholecystitis. (*Id.*) Dr. Rose saw no evidence of biliary dilatation. (*Id.*)

Claimant again treated with PA Lutz on June 5, 2013. (Tr. at 599). PA Lutz noted that Claimant was there for a follow up to chronic abdominal pain. (*Id.*) Claimant admitted to PA Lutz that he continued to drink alcohol. (*Id.*) He also reported going fishing, working in his garden, and cooking on his grill. (*Id.*) PA Lutz assessed Claimant with GERD, alcoholic fatty liver, epigastric pain, and H. pylori infection. (Tr. at 603).

### B. Evaluations and Opinions

On December 14, 2011, Judith F. Lucas, M.A., completed a psychological evaluation for the West Virginia Disability Determination Service. (Tr. at 407-09). Claimant informed Ms. Lucas that a friend drove him to the evaluation and that he did not believe he could drive due to numbness and tingling in both legs. (Tr. at 407). Ms. Lucas noted that Claimant had no difficulty ambulating. (*Id.*) Claimant stated that he was unable to work as a result of a back injury. (*Id.*) Since that injury, Claimant began drinking a six-pack of beer every day or every other day and felt depressed. (*Id.*) Claimant also reported experiencing panic attacks and difficulty sleeping. (*Id.*) He indicated that he had never been placed in a psychiatric hospital, but he had attended counseling following his conviction for driving under the influence of alcohol. (*Id.*) Claimant informed Ms. Lucas that his daily activities included watching television, reading, going on the internet, performing light household cleaning, cooking, doing laundry, walking to visit his mother

nearby, and caring for his cat. (Tr. at 409). Claimant's friend performed any necessary yard work for him. (*Id.*) Claimant stated that sometimes his friends would call and ask him to go places, but he usually declined. (*Id.*)

On mental status examination, Claimant was cooperative and related appropriately with Ms. Lucas. (Tr. at 408). His speech was normal, and he was oriented. (*Id.*) Ms. Lucas remarked that Claimant exhibited no disturbance of mood, and his affect was broad. (*Id.*) Claimant's thought processes, thought content, and judgment were normal. (*Id.*) His insight was fair, and his immediate and recent memory were within normal limits. (*Id.*) Claimant's concentration was mildly deficient given that he made one error in performing serial threes. (*Id.*) Claimant reported experiencing suicidal thoughts, but stated that he did not feel he would act on those thoughts. (*Id.*) Ms. Lucas observed no abnormal psychomotor behavior. (*Id.*) She diagnosed Claimant with major depressive disorder, panic disorder without agoraphobia, and alcohol abuse. (Tr. at 409). She opined that Claimant's prognosis was guarded. (*Id.*) In addition, Ms. Lucas concluded that Claimant's social functioning, persistence, and pace were within normal limits. (*Id.*)

On December 15, 2011, Kip Beard, M.D., performed an internal medicine examination for the West Virginia Disability Determination Service. (Tr. at 412-16). Dr. Beard recorded that Claimant's chief complaint was a chronic back problem. (Tr. at 412). Claimant informed Dr. Beard that he had surgery to treat a ruptured disc when he was twenty-one years old. (*Id.*) Claimant stated that he recovered after the surgery but began experiencing back and leg discomfort again in July 2007 while performing work that required frequent bending and lifting. (*Id.*) Dr. Beard noted that Claimant had treated with Dr. Weinstein, who did not believe that Claimant required surgery for his back. (*Id.*) Claimant also treated with Dr. Caraway, who performed epidural injections that provided

temporary relief. (*Id.*) Claimant indicated that a spinal cord stimulator was recommended for him, but his insurance would not cover it. (*Id.*) Claimant described pain in his low back that ranged from a sharp pain to an ache, and he rated the pain as a six out of ten. (*Id.*) He stated that the pain radiated down his right leg into the foot and that he experienced posterolateral right leg numbness involving the third through the fifth toes of the right foot. (Tr. at 412-13). Claimant also reported some numbness into the posterolateral proximal left thigh. (Tr. at 413). He informed Dr. Beard that he was limited in any persistent, prolonged, or repetitive activity and that he was not able to sit, stand, or walk for a long period of time. (*Id.*) Claimant indicated that he had to change positions frequently and that he could not lift much weight. (*Id.*) At the time of the examination, Claimant was using Lortab, Lyrica, and a TENS unit, which all helped minimally. (*Id.*)

Upon examination, Dr. Beard remarked that Claimant's gait was uncomfortable, stiff, slow, and guarded; however, Claimant did not use an assistive device to ambulate. (Tr. at 414). Dr. Beard noted that Claimant was uncomfortable throughout the assessment and exhibited consistent activity throughout without any obvious exaggerated activity. (*Id.*) Claimant appeared uncomfortable in both the seated and supine positions. (*Id.*) He was able to stand unassisted, but he had mild difficulty arising from a seated position and stepping up and down from the examination table. (*Id.*) Cardiovascular and respiratory examinations were normal. (Tr. at 414-15). Examination of Claimant's extremities revealed palpable dorsalis pedis and posterior tibial pulses with no evidence of clubbing, cyanosis, or edema. (Tr. at 415). Dr. Beard found that Claimant's cervical spine was normal with no limitations in range of motion. (*Id.*) Examination of Claimant's arms, hands, knees, ankles, and feet were unremarkable and revealed normal range of motion. (*Id.*) Claimant exhibited moderate pain with range of motion testing of the dorsolumbar

29

spine. (*Id.*) Claimant's dorsolumbar spine flexion was limited to sixty-five degrees and lateral bending was limited to twenty-five degrees. (*Id.*) Dr. Beard recorded paravertebral tenderness with spasm in Claimant's dorsolumbar spine. (*Id.*) Claimant was able to stand on one leg with pain. (*Id.*) A seated straight leg raise test on the left produced some mild back pain and proximal left thigh pain at ninety degrees. (*Id.*) A seated straight leg test on the right produced moderate pain radiating down the leg and a positive Pick sign at eighty degrees. (*Id.*) A supine straight leg raise test on the left produced back and proximal thigh discomfort at eighty degrees while the same test on the right produced moderate pain down the right leg at sixty degrees. (Tr. at 415-16). Dr. Beard recorded that Claimant's hips were not painful or tender and retained normal range of motion. (Tr. at 416). Neurologic examination revealed right ankle weakness (4/5) along with some diminished sensation in Claimant's right lower extremity consistent with S1 distribution and some early right calf atrophy. (*Id.*) Claimant's deep tendon reflexes of the biceps, triceps, patellae, and left Achilles were 2+, but right Achilles deep tendon reflex was absent. (*Id.*) Dr. Beard observed that Claimant was able to heel-walk, toe-walk with pain, tandem walk, and squat with mild difficulty arising. (*Id.*)

Dr. Beard assessed Claimant with right lumbar radiculopathy and history of remote lumbar surgery. (*Id.*) Although Claimant exhibited an uncomfortable gait, Dr. Beard did not see any obvious need for an ambulatory aid. (*Id.*) Dr. Beard noted that Claimant experienced moderate lumbar spine discomfort with spasm and motion loss. (*Id.*) He opined that Claimant's straight leg raise tests were moderately positive in two positions on the right. (*Id.*) Dr. Beard concluded that these findings, along with the absence of a right Achilles reflex and weakness of the right ankle, were consistent with a diagnosis of right lumbar radiculopathy. (*Id.*)

On December 20, 2011, Joseph A. Shaver, Ph.D., completed a Psychiatric Review Technique. (Tr. at 392-404). Dr. Shaver recognized that Claimant suffered from major depressive disorder, an anxiety-related disorder involving panic attacks, and alcohol abuse. (Tr. at 395, 397, 400). However, Dr. Shaver concluded that these mental impairments were non-severe. (Tr. at 392). In assessing the paragraph B criteria for Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders), Dr. Shaver opined that Claimant had mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 402). Dr. Shaver noted that Claimant had no episodes of decompensation of extended duration. (*Id.*) In addition, Dr. Shaver concluded that Claimant did not meet the paragraph C criteria for Listings 12.04 and 12.06. (Tr. at 403). In the "Consultant's Notes" section of the form, Dr. Shaver summarized Ms. Lucas's findings at the psychological examination and acknowledged that Claimant had received outpatient treatment for depression at Greenbrier Physicians, Inc. (Tr. at 404). Dr. Shaver also summarized the activities that Claimant reported he was capable of performing, which included taking care of his pets, preparing simple meals, cleaning his home, doing laundry, driving for short periods, watching television, using the internet, reading, talking on the phone, attending doctor's appointments, and visiting his mother. (*Id.*) Dr. Shaver concluded that Claimant's reported mental functioning appeared to be consistent with the available medical evidence. (*Id.*) He opined that Claimant possessed the mental capacity to engage in gainful work-like activity on a sustained basis. (*Id.*)

On January 4, 2012, Subhash Gajendragadkar, M.D., completed a Physical RFC Assessment. (Tr. at 417-24). With respect to exertional limitations, Dr. Gajendragadkar opined that Claimant could occasionally lift and/or carry twenty pounds; frequently lift

and/or carry ten pounds; stand and/or walk for four hours in an eight-hour workday; and sit for six hours in an eight-hour workday provided that Claimant would be permitted to alternate between sitting and standing every twenty to thirty minutes. (Tr. at 418). Claimant was also mildly limited in his ability to push or pull using his right lower extremity due to right ankle weakness. (*Id.*) As for postural limitations, Dr. Gajendragadkar determined that Claimant could occasionally climb ramps or stairs, balance, stoop, and kneel; however, Claimant could never crouch, crawl, or climb ladders, ropes, or scaffolds. (Tr. at 419). In addition, Dr. Gajendragadkar opined that Claimant had no manipulative, visual, or communicative limitations. (Tr. at 420-21). On the subject of environmental limitations, Dr. Gajendragadkar found that Claimant could have unlimited exposure to extreme heat, wetness, humidity, and noise; however, Claimant should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 421). Moreover, Claimant should avoid even moderate exposure to hazards, such as machinery or heights. (*Id.*) In the "Additional Comments" section of the form, Dr. Gajendragadkar summarized treatment records from St. Mary's Hospital, Greenbrier Physicians, Inc., and Vaught Neurological. (Tr. at 424). Dr. Gajendragadkar also reviewed Dr. Beard's findings at the internal medicine examination and Claimant's statements contained in his Personal Pain Questionnaire and Adult Function Report. (Tr. at 422, 424). Dr. Gajendragadkar opined that Claimant's statements were mostly credible, except his assertion that he could not lift over five pounds. (Tr. at 422).

On February 9, 2012, Rosemary L. Smith, Psy.D., completed a case analysis. (Tr. at 425). After reviewing all of the evidence in Claimant's file, Dr. Smith affirmed Dr. Shaver's Psychiatric Review Technique. (*Id.*)

On February 13, 2012, Narendra Parikshak, M.D., completed a case analysis. (Tr. at 426). Dr. Parikshak noted that there was no new medical evidence to suggest that Claimant suffered from increased functional limitations. (*Id.*) After reviewing the medical evidence of record, Dr. Parikshak affirmed Dr. Gajendragadkar's Physical RFC Assessment. (*Id.*)

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

### A. The ALJ's RFC Finding and Controlling Hypothetical Question

In his first argument, Claimant asserts that the ALJ's RFC finding failed to adequately address Claimant's moderate difficulty in maintaining concentration, persistence, or pace. (ECF No. 12 at 11-12). Claimant contends that the ALJ erred by neglecting to include any limitations in his RFC finding and the hypothetical questions posed to the vocational expert related to Claimant's ability to focus and stay on task. (*Id.* at 11). For support, Claimant primarily relies on the Fourth Circuit's recent decision is *Mascio.* (*Id.*)

In *Mascio*, the ALJ determined at step three that the claimant experienced moderate difficulties in maintaining concentration, persistence, or pace; however, the ALJ failed to include any mental limitations in the controlling hypothetical question presented to the vocational expert. 780 F.3d at 637-38. While the vocational expert supplied a list of jobs that were unskilled, the Fourth Circuit found that this was insufficient to account for the claimant's moderate mental limitations and held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The court indicated that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."[3] *Id.* Because the ALJ failed to either include any mental limitation

---

[3] Listing 12.00 explains that "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3).

in the RFC or explain why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the ALJ's RFC finding, the Fourth Circuit found that remand was appropriate. *Id.*

The same issue was recently addressed by this Court in *Jackson v. Colvin*, No. 3:14-cv-24834, 2015 WL 5786802, at *4-*5 (S.D.W.Va. Sept. 30, 2015). There, the ALJ found that the claimant experienced moderate deficiencies in concentration, persistence, or pace. *Id.* at *1. Attempting to take this limitation into account, the ALJ restricted the claimant to work involving simple tasks and instructions; however, the Court recognized that this was inadequate under *Mascio. Id.* at *4. The Court explained the principle espoused in *Mascio*: "If the ALJ found [the claimant] had moderate mental limitations related to concentration, persistence, or pace—which here the ALJ found—the ALJ should have either included those limitations in the hypothetical or explained in the RFC assessment why, despite finding these moderate mental limitations, it was unnecessary to include them in the hypothetical. Failure to do so requires remand." *Id.* The Court found that remand was appropriate because the ALJ did neither.[4] *Id.* at *5.

In this case, when assessing the severity of Claimant's mental impairments at step three of the disability process, the ALJ concluded that Claimant experienced moderate difficulty in maintaining concentration, persistence, or pace. (Tr. at 16). The ALJ explicitly acknowledged that this finding was more restrictive than the findings of the consulting psychologists; nevertheless, the ALJ indicated that he would explain his reasoning later in the written decision. (*Id.*) Unfortunately, the discussion that followed on this issue was confusing at best and inherently inconsistent at worst. During the RFC assessment, the

---

[4] The Court noted that "what was pivotal in *Mascio* was not the claims or evidence presented in the agency proceeding, but the ALJ's finding [of moderate difficulties in concentration, persistence, or pace]." *Jackson*, 2015 WL 5786802, at *4.

ALJ remarked that Claimant's depressive disorder and alcohol abuse could "reasonably be expected to cause some difficulties in maintaining concentration, persistence, or pace." (Tr. at 21). However, he then described Claimant's depressive disorder as "only marginally severe in nature" and further stated that Claimant's resulting functional limitation was "***only***" moderate given "the form of [C]laimant's testimony at the hearing, his acknowledgment that he is able to read novels written by Stephen King, and the objective clinical findings recorded by [Ms. Lucas]." (*Id.*) The ALJ concluded his discussion of Claimant's mental limitations by stating:

> Thus, limitations imposed by mental impairments do not prevent claimant from performing the basic mental demands of competitive, remunerative, unskilled work delineated in Social Security Ruling 85-15. Specifically, claimant is able to (on a sustained basis) understand, remember, and carry out simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. However, as claimant is found to have moderate difficulties in maintaining concentration, persistence, or pace, the undersigned finds that claimant is unable to perform jobs that require following detailed or complex instructions.

(*Id.*)

Clearly, the ALJ's RFC finding lacks a logical bridge to his earlier determination that Claimant had a moderate impairment of his ability to maintain concentration, persistence, or pace. On the one hand, the ALJ emphasized at step three of the process that Claimant had a more severe limitation of his ability to maintain concentration, persistence, or pace than was suggested by the agency psychologists. However, on the other hand, the ALJ curiously downplayed Claimant's mental limitations when assessing his RFC. The only restriction that the ALJ included in Claimant's RFC finding to account for his moderately deficient concentration, persistence, or pace was to eliminate jobs that involved detailed or complex instructions. As Claimant argues, that limitation does not

appear to directly address Claimant's ability to stay on task, and the ALJ never explained how that limitation, alone, was sufficient in Claimant's case.

In sum, rather than agreeing with the agency psychologists that Claimant suffered from a mild restriction in maintaining concentration, persistence, or pace, the ALJ made it a point to find a more serious limitation, but then failed to adequately address it later. While it appears that the ALJ attempted to give Claimant the benefit of the doubt on the extent of his mental limitations, the ALJ's failure to follow through on his step three finding produced a fractured and confused analysis. Furthermore, the ALJ's conclusion that Claimant could perform work involving simple instructions "on a sustained basis" did not adequately address his determination that Claimant labors under moderate difficulties in concentration, persistence, or pace. The ALJ erred when he failed to sufficiently explain and resolve that apparent conflict.[5] *See Mascio*, 780 F.3d at 638. Ultimately, a subsequent reviewer of the ALJ's written decision cannot follow the ALJ's rationale with respect to the functional limitations that resulted from Claimant's mental impairments. Given that analytical gap, a subsequent reviewer is likewise unable to conclude that the jobs identified by the vocational expert adequately accounted for Claimant's functional limitations. Therefore, the undersigned **FINDS** that the ALJ erred in his analysis of Claimant's RFC and **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be remanded so that the ALJ may reconsider, or elaborate on his discussion of, Claimant's mental restrictions.

---

[5] Although the ALJ recognized that the medical opinion evidence and Claimant's activities demonstrated an ability to maintain some level of concentration, persistence, or pace, once the ALJ found that Claimant experienced moderate difficulties in that area, he should have included limitations in the RFC finding to account for the impairments or explained why he declined to do so. The ALJ did neither.

## B. The ALJ's Credibility Analysis

In his second challenge to the Commissioner's decision, Claimant asserts that the ALJ failed to properly evaluate his credibility. (ECF No. 12 at 12-14). Under the Social Security Regulations and Rulings, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the

credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's

evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ considered Claimant's allegations of his symptoms using the two-step process required by the Regulations. First, the ALJ determined that Claimant's

medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 19). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*) In assessing Claimant's credibility, the ALJ summarized Claimant's testimony at the administrative hearing. (Tr. at 17). The ALJ acknowledged Claimant's reports of lower back pain with radiation to his legs that was not fully relived by back injections, pain medication, or the use of a TENS unit. (*Id.*) In addition, the ALJ recognized that Claimant indicated his back and leg pain prevented him from sitting or standing for more than fifteen to twenty minutes without changing position. (*Id.*) The ALJ also noted that Claimant testified he lived alone and was able to drive, shop for groceries, prepare meals, wash dishes, vacuum the floor, and read novels, but he relied on relatives to help with some household chores. (*Id.*)

The ALJ went on to outline treatment notes from Claimant's physicians and radiological findings related to Claimant's back condition. (Tr. at 18-20). With respect to PA Lutz, the ALJ asserted that Claimant had treated with PA Lutz since September 2011 and that Claimant rarely mentioned back pain to PA Lutz. (Tr. at 19). Moreover, the ALJ found that PA Lutz's clinical findings related to Claimant's musculoskeletal and neurological systems were "relatively unremarkable apart from restricted range of motion of the back and some neurological deficits in the right lower extremity." (*Id.*) As for the radiological findings, the ALJ observed that a December 2010 MRI of Claimant's thoracic spine showed very mild canal stenosis at T11-12 secondary to disc bulge that was found to be mild in nature. (*Id.*) Additionally, the ALJ noted that a January 2013 MRI of Claimant's lumbar spine showed stability apart from a new small disc herniation at L5-S1 that did not compress Claimant's left nerve root in the lateral recess. (*Id.*) On the subject of

Claimant's treatment for his back, the ALJ noted that Claimant underwent a right L5-S1 discectomy in August 1998, but Claimant was able to work after that procedure in light and medium exertional level jobs until 2007. (*Id.*) The ALJ recognized that Claimant's subsequent treatment was relatively conservative, including medication and two epidural injections, and the ALJ again asserted that Claimant "rarely mentioned musculoskeletal/neurological problems to his primary care provider." (Tr. at 19-20). The ALJ also indicated that Claimant had not treated with a specialist for his back problem in a number of years and that the last time Claimant visited a specialist in January 2011, surgery was not recommended. (Tr. at 18, 20).

Additionally, the ALJ contemplated Claimant's other alleged impairments in assessing his credibility. For example, the ALJ found that Claimant's hypertension was managed by medication and had not resulted in end-organ damage. (Tr. at 19). With respect to Claimant's COPD, the ALJ contended that Dr. Beard's examination of Claimant's respiratory system was unremarkable and that there was no evidence that Claimant required treatment from a specialist or emergency care for this condition. (Tr. at 19-20). The ALJ also addressed Claimant's pancreatitis. (Tr. at 20). The ALJ recognized that the condition was alcohol-induced and that Claimant testified at the August 2013 administrative hearing that he had not drank alcohol in six to eight months (or since his last hospitalization), but was hospitalized in May 2013 for acute abdominal pain symptoms similar to those he experienced during episodes of acute alcoholic pancreatitis. (Tr. at 20, 39). Finally, the ALJ assessed Claimant's allegation of depression, concluding that the clinical findings showed Claimant's depression was not "particularly symptomatic" and that Claimant's treatment for his depression was limited. (Tr. at 21).

The ALJ supplied other reasons for discounting Claimant's credibility as well. He

determined that Claimant's activities of daily living, including driving a car, shopping for groceries, preparing meals, washing dishes, vacuuming, doing laundry, and cleaning his home, were inconsistent with the physical limitations that Claimant alleged. (Tr. at 20). Further, the ALJ implicitly found that the opinions of Dr. Gajendragadkar and Dr. Parikshak undermined Claimant's allegations with respect to his physical limitations. (*Id.*)

Overall, the ALJ supplied a number of good reasons for discounting Claimant's credibility. While the ALJ may not have explicitly discussed each SSR 96-7p factor in the written decision, he was not required to do so; instead, the ALJ was only required to consider each factor. *See, e.g.*, *Hedrick v. Colvin*, No. 3:14-23775, 2015 WL 5003658, at *13 (S.D.W.Va. Aug. 21, 2015) (collecting cases). When scrutinizing Claimant's allegations, the ALJ appropriately recognized that the more recent clinical and radiological findings related to Claimant's low and mid back were relatively mild, which tended to belie the physical limitations asserted by Claimant. Moreover, aside from a 1998 discectomy, Claimant's treatment for his back problem was conservative and additional surgery was not recommended by any treating physician. *See Stitely v. Colvin*, ____ F. App'x ____, 2015 WL 4621292, at *2 (4th Cir. Aug. 4, 2015) (recognizing that conservative treatment may be used as factor in credibility analysis). In addition, clinical findings indicated that Claimant's other alleged impairments, such as hypertension and COPD, appeared to be controlled with conservative treatment, and Claimant's applications for benefits focused on his back pain and depression. The ALJ also properly noted that Claimant's ability to perform certain activities, including driving, grocery shopping, preparing meals, washing dishes, doing laundry, and cleaning his home, undermined his description of his physical limitations. Although Claimant takes issue with the ALJ's

purported failure to include certain caveats related to Claimant's activities in the written decision, the ALJ clearly considered Claimant's testimony and the Adult Function Report that he completed describing any limitations in performing these activities. (Tr. at 17, 20). The ALJ further recognized that Claimant informed Ms. Lucas in December 2011 (three months after Claimant completed his Adult Function Report) that he was able to clean his home, cook for himself and his mother, walk a short distance to his mother's home each day, do laundry, and shop in Wal-Mart. (Tr. at 18, 409). Claimant also informed PA Lutz in June 2013 that he was able to go fishing and work in his garden. (Tr. at 599). Furthermore, the ALJ correctly noted that the medical opinion evidence tended to contradict some of the severe physical limitations that Claimant alleged. Additionally, though Claimant's testimony was somewhat equivocal on the topic, the ALJ aptly questioned Claimant's credibility based on his assertion at the August 2013 hearing that he had been sober for six to eight months when it appeared that Claimant had symptoms of acute alcoholic pancreatitis three months prior in May 2013. Moreover, in June 2013, Claimant informed PA Lutz that he had been drinking beer intermittently. (Tr. at 599). Finally, the undersigned notes that, other than his argument concerning the ALJ's summary of his daily activities, Claimant has not specifically identified additional evidence relevant to the SSR 96-7p factors that he believes the ALJ failed to consider.

Notwithstanding the multitude of good reasons that the ALJ supplied for discounting Claimant's allegations, the undersigned recognizes that the ALJ erred in his assessment of Claimant's treatment with PA Lutz. The ALJ indicated that Claimant had treated with PA Lutz since September 2011; however, treatment records from PA Lutz demonstrate that Claimant visited him beginning in December 2007 and continued to do so through June 2013. (Tr. at 371, 604). Although the ALJ found that Claimant rarely

mentioned back pain to PA Lutz, the treatment notes from December 2007 to August 2011 evidence consistent complaints of back pain and stiffness. (Tr. at 288, 306, 314, 344, 352, 354, 356, 361, 369, 371). The ALJ apparently disregarded these records because he believed that they had been considered in previously denying Claimant's February 2009 applications for benefits; yet, many of the records post-date the SSA's denial of Claimant's earlier applications. (Tr. at 15). In any event, since the undersigned is recommending remand based on Claimant's first challenge, the undersigned need not consider whether this error prejudiced Claimant. Rather, the ALJ should reconsider Claimant's credibility on remand and correct any factual errors.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for summary judgment, (ECF No. 12), insofar as it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this

Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  December 4, 2015

_____
Cheryl A. Eifert
United States Magistrate Judge